UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

BEECHWOOD RESTORATIVE CARE CENTER,

                    Plaintiff,

                                                    DECISION AND ORDER

                                                    05-CV-6299L

           v.

TOMMY G. THOMPSON,
Secretary of the Department of
Health and Human Services,
MARK B. McCLELLAN,
Administrator of the Centers for
Medicare and Medicaid Services,

                    Defendants.

_____

        This is another chapter in the contentious relationship between a nursing home and the

governmental agencies charged with monitoring its care of patients. This action is brought by the

nursing home.  Beechwood Restorative Care Center ("Beechwood"), seeks review of a final

decision of the Departmental Appeals Board  ("DAB")[1] of the Department of Health and Human

_____

        [1]Because of the plethora of acronyms used by the parties and the Court, the following
table is provided:

CMP - civil money penalty

CMS - Centers for Medicare and Medicaid Services (federal agency responsible for

                                                    (continued...)

Services ("HHS"), upholding penalties imposed on Beechwood, including the termination of

Beechwood's participation in the Medicare and Medicaid programs, as a result of federally-

mandated surveys conducted by the New York State Department of Health ("State DOH"), which

found various deficiencies at Beechwood.  Plaintiff has moved for summary judgment on five of

its twelve claims.  Defendants, the Secretary of the Department of Health and Human Services

("HHS") and the Administrator of the Centers for Medicare and Medicaid Services ("CMS"),  a

federal agency and a part of HHS, have cross-moved for judgment on the pleadings as to the

entire complaint, and to strike evidence outside the administrative record that plaintiff has

submitted in support of its summary judgment motion.

---

[1](...continued)
administering the Medicare, Medicaid, and several other health-related programs)

DAB - Departmental Appeals Board of the United States Department of Health and Human
Services

DOH - New York State Department of Health

DPNA - denial of payment for new admissions

DPOC - Directed plan of correction

HHS - United States Department of Health & Human Services

SOD - statement of deficiencies (report prepared by state agency detailing instances of a facility's
noncompliance with federal certification requirements)

**BACKGROUND**

Much of the relevant factual background is set forth in prior decisions of this Court and of the Court of Appeals for the Second Circuit in a related action, in which Beechwood sued various state and federal officials pursuant to 42 U.S.C. § 1983 and (with respect to the federal defendants) *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971), alleging a number of constitutional violations in connection with the investigation and eventual shutting down of Beechwood. *See Beechwood Restorative Care Center v. Leeds*, 317 F.Supp.2d 248 (W.D.N.Y. 2004), *aff'd in part, and vacated and remanded in part*, 436 F.3d 147 (2$^d$ Cir. 2006). The gist of Beechwood's allegations in that action was that the defendants had targeted Beechwood not because of any actual deficiencies at Beechwood, but to retaliate against Beechwood's owners, Brook Chambery ("Chambery") and his mother Olive Chambery, and to ruin their business, as punishment for Chambery's exercise of his First Amendment rights by challenging defendants in administrative proceedings, and criticizing their requirements and procedures. Familiarity with those decisions is assumed, and only a brief summary will be provided here, with additional facts set forth as necessary to resolve the parties' pending motions.

During its years of operation, Beechwood was a skilled nursing facility operated by a partnership between Olive and Brook Chambery. As a requirement of its operating certificate issued by New York State, Beechwood was certified as a participant in the Medicare and

Medicaid programs.  As such, Beechwood was regulated jointly by the State DOH and the

Federal CMS, and was subject to inspections by the State DOH to monitor its compliance with

federal and state regulations.[2]

In 1994, Chambery and  the State DOH began clashing over certain regulatory matters,

the details of which are unimportant here.  In 1995, following an inspection, the State DOH

identified two deficiencies at Beechwood.[3]  Although Chambery successfully challenged those

deficiencies in an informal dispute resolution process afforded by federal regulation, this was the

start of what Chambery alleged was an escalating pattern of deficiency findings by DOH,

allegedly motivated by retaliation, which culminated in CMS's termination of Beechwood's

Medicare and Medicaid provider status, and  the State DOH's revocation of Beechwood's

operating certificate, which effectively put Beechwood out of business.   The facility closed on

July 16, 1999.  The Beechwood property eventually entered foreclosure proceedings and was

sold at public auction in March 2002.

Beechwood filed the complaint in this action on July 15, 2004, in the United States

District Court for the District of Columbia.  By order entered April 20, 2005, that court granted

defendants' unopposed motion to transfer the case to this district.

_____

[2]Prior to July 1, 2001, CMS was known as the Health Care Financing Administration
("HCFA").  Since most of the relevant events occurred prior to that date, the decisions of this
Court and of the Court of Appeals in *Leeds* generally use the acronym HCFA.  The parties in the
case at bar have used the acronym CMS, however, as will the Court in this Decision and Order.

[3]"Deficiency" is defined as a facility's "failure to meet a participation requirement
specified in" the Medicare and Medicaid Acts or the relevant regulations.  42 C.F.R. § 488.301.

**II. Plaintiff's Claims**

The gist of plaintiff's claims is that, contrary to the State DOH's findings, there were no deficiencies at Beechwood serious enough to justify CMS's termination of Beechwood's Medicare/Medicaid status in June 1999, or the other sanctions and remedies imposed by CMS, such as denial of payment for new admissions ("DPNA") and a directed plan of correction, *see* 42 U.S.C. § 1395i-3(h)(2).  Plaintiff also alleges that although some of the alleged deficiencies were eventually overturned on appeal to the HHS's Departmental Appeals Board ("DAB"), the DAB wrongfully sustained Beechwood's termination.  Plaintiff alleges that CMS's actions were arbitrary and capricious and were not in accordance with law, and that CMS thereby denied Beechwood due process and equal protection.

Based on these allegations, plaintiff has pleaded twelve causes of action, based on the following allegations:  (1) CMS improperly imposed certain remedies on Beechwood based on the State DOH's findings, without making its own independent determinations as to Beechwood's compliance with the relevant regulations, and without requiring proper certifications from the State DOH, Complaint ¶¶ 153-60; (2) CMS, and its "agent" the State DOH, failed to follow HHS protocols and procedures in conducting the survey and enforcement process with respect to Beechwood in a number of respects,  Complaint ¶¶ 161-95; (3) CMS's termination of Beechwood did not follow federally-mandated notice requirements; (4) CMS's termination of Beechwood violated Beechwood's right to equal protection because CMS has imposed only civil money penalties ("CMPs"), or other remedies short of termination, against

similarly-situated facilities elsewhere; (5) there were due process and other violations in connection with the imposition of CMPs by the State DOH;[4] (6) CMS imposed a DPNA in May 1999 without the fifteen-day notice period required by 42 C.F.R. § 488.408(f); (7) the hearing procedures and adjudication standards used by the administrative law judge ("ALJ") during Beechwood's federal administrative proceedings were deficient in a number of respects, such as the ALJ's reliance on the testimony of an uncertified surveyor and unpublished or unrecognized professional standards of care, and his failure to adjudicate the scope and severity of each alleged deficiency; (8) the directed plan of correction and termination were improper because they were based on an April 1999 statement of deficiencies ("SOD") prepared by the State DOH, which alleged only past noncompliance, not existing noncompliance;[5] (9)-(11) the DAB's final determinations sustaining certain deficiency findings contained in the May, June and April 1999 SODs, respectively, were not supported by substantial evidence; and (12) even if CMS properly sustained those deficiencies, the remedies imposed on Beechwood by CMS were not justified by the underlying factual findings.

Based on these claims and allegations, Beechwood requests that the Court declare unlawful and set aside CMS's actions which sustained the various deficiency findings, and

_____

[4]It is not entirely clear how the fifth cause of action, which focuses on actions taken by DOH, purports to state a claim against HHS and CMS. Plaintiff appears to contend that CMS wrongly refused to review DOH's imposition of CMPs. *See* Complaint ¶¶ 213-15.

[5]A statement of deficiencies is a report prepared by the designated state agency that details instances of a facility's noncompliance with federal certification requirements. *See* 42 C.F.R. § 488.325(f).

which upheld  or imposed penalties and remedies against Beechwood, including the termination

of Beechwood's Medicare/Medicaid provider status.  Plaintiff also seeks attorney's fees pursuant

to 28 U.S.C. § 2412.


**III. The Parties' Motions**

Beechwood moves for summary judgment on its first, fourth, fifth, sixth and eighth

claims.  Specifically, Beechwood seeks an order:  (1) on its first and sixth claims, declaring that

CMS's actions in imposing a DPNA and other remedies against Beechwood in 1999 were

unlawful, and ordering CMS to reimburse Beechwood for services that Beechwood provided to

Medicare- and Medicaid-eligible residents admitted on or after May 21, 1999; (2) on its fourth

claim, declaring that CMS's termination of Beechwood without first imposing less severe

penalties, such as civil money penalties, was unlawful; (3) on its fifth claim, declaring that

CMS's actions in permitting the State DOH to impose civil money penalties was unlawful; and

(4) on its eighth claim, declaring that CMS's termination of Beechwood following the April 1999

SOD was unlawful, because Beechwood was in compliance with federal requirements on the

date of the April 1999 State DOH survey.

Defendants move for judgment on the pleadings dismissing the entire complaint pursuant

to Rule 12(c) of the Federal Rules of Civil Procedure.  Defendants also move to strike an

affidavit of Brook Chambery, and the exhibits attached to it, that plaintiff has submitted in

support of its summary judgment motion.  Defendants contend that the Court's review should be

limited to the administrative record, and that these documents improperly seek to supplement that record.

# DISCUSSION

## I. Mootness

The first matter that should be addressed before dealing with the merits of plaintiff's claims is the issue of mootness. Defendants contend that Beechwood's contentions with respect to its terminations from Medicare and Medicaid programs are moot because even if the Court were to find that Beechwood had been improperly terminated, the Court could order no effective relief, since: Beechwood no longer has an operating license from New York State; it could not currently participate in the Medicare and Medicaid programs in any event; it ceased operations eight years ago, in 1999; and its building was sold in a foreclosure action.

In response, Beechwood advances several reasons why, in its view, this case is not moot. First, Beechwood states that if the Court rules in Beechwood's favor, the remedies imposed against Beechwood by CMS will be "overturned," Beechwood's Opposition Brief (Dkt. #29-1) at 40. Second, Beechwood states that such a ruling would compel CMS to alter the way that it conducts future hearings with others with respect to Medicare and Medicaid program participants, and that the ruling would have a "name clearing" effect for Beechwood and the Chamberys.

Beechwood also contends that it has a financial stake in the outcome of this case because two of its claims, if resolved in Beechwood's favor, would allow it to obtain monetary relief.  In support of that contention, Beechwood relies on its fifth and sixth causes of action, which respectively concern the State DOH's imposition of CMPs, and CMS's May 1999 imposition of a DPNA.  Beechwood contends that a ruling in its favor on those claims would entitle it to recovery for the wrongfully-imposed CMPs, and for services that it rendered to Medicare- or Medicaid-eligible patients following the DPNA.

In addition, Beechwood states that if it obtains a favorable ruling in this action, it will seek to use that ruling in connection with other litigation.  For instance, Beechwood states that a declaration by this Court that the State DOH improperly imposed CMPs on Beechwood could be used in an action in the New York Court of Claims to recover the amounts of those CMPs from the state.

Similarly, Beechwood contends that the declaratory relief that it seeks in this action could have important "collateral consequences" in Beechwood's pending § 1983 action mentioned above, *Beechwood Restorative Care Center v. Leeds*, which is currently pending in this Court. Beechwood argues that declaratory relief in the instant action would "confirm" the truth of some of plaintiffs' allegations in the *Leeds* action, and would provide circumstantial evidence of the retaliatory nature of the actions taken against Beechwood.  Dkt. #29-1 at 43.

"It has long been settled that a federal court has no authority 'to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the

matter in issue in the case before it.'" *Church of Scientology of California v. United States*, 506 U.S. 9, 12 (1992) (quoting *Mills v. Green*, 159 U.S. 651, 653 (1895)); *accord Calderon v. Moore*, 518 U.S. 149, 150 (1996).  A case "should therefore be dismissed as moot when, by virtue of an intervening event, a court ... cannot grant 'any effectual relief whatever' in favor of the [plaintiff]." *Calderon*, 518 U.S. at 150 (quoting *Mills*, 159 U.S. at 653).  "'[A] case is moot when the issues presented are no longer "live" or the parties lack a legally cognizable interest in the outcome.'" *County of Los Angeles v. Davis*, 440 U.S. 625,  (1979) (quoting *Powell v. McCormack*, 395 U.S. 486, 496 (1969)).  *See also White River Amusement Pub, Inc. v. Town of Hartford*, 481 F.3d 163, 167 (2$^d$ Cir. 2007) (case is not moot if plaintiff's injury is "likely to be redressed by a favorable judicial decision") (quoting *Catanzano v. Wing*, 277 F.3d 99, 107 (2$^d$ Cir. 2001)).

Applying these principles here, I find that to a great extent, Beechwood's claims in this action are moot.  Beechwood is closed, its state operating license has been revoked by the State DOH, and the building where the nursing facility was operated has been sold.  There is also no indication in the record that the Chamberys intend or desire to reopen Beechwood or a similar facility if they obtain relief in this action.  Even if the Chamberys sought to open a new facility, any relief concerning Beechwood would not benefit that new facility.  In sum, it is impossible for this Court to grant any effective relief to plaintiff.  *Church of Scientology*, 506 U.S. at 12  ("if an event occurs while a case is pending on appeal that makes it impossible for the court to grant any effectual relief whatever to a prevailing party, the appeal must be dismissed" as moot) (internal quote omitted); *In re DSC, Ltd.*, 486 F.3d 940, 945 (6th Cir. 2007) ("A claim becomes moot ...

'when the plaintiff receives the relief sought or when it is factually, not legally, impossible to receive such relief'") (quoting *Liberles v. Cook County*, 709 F.2d 1122, 1127 (7th Cir. 1983)); *Cook v. Colgate Univ.*, 992 F.2d 17, 19 (2d Cir. 1993) (a case becomes moot "when it becomes impossible for the courts, through the exercise of their remedial powers, to do anything to redress the injury").

The fact that a plaintiff business has ceased operation, standing alone, will not necessarily moot a claim by the business against a governmental entity.  In *City of Erie v. Pap's A.M.*, 529 U.S. 277 (2000), for example, in which a corporation ("Pap's") that operated an establishment featuring nude erotic dancing brought an action challenging the constitutionality of a city ordinance proscribing nudity in public places, the Supreme Court held that the case was not mooted by the fact that Pap's had ceased operating its establishment, since Pap's "[wa]s still incorporated under Pennsylvania law, and it could again decide to operate a nude dancing establishment in Erie."  *Id.* at 287.

The following year, in *City News and Novelty, Inc. v. City of Waukesha*, 531 U.S. 278 (2001), the Supreme Court again addressed the issue of whether a plaintiff's cessation of business operations moots its claims, but reached a different result.  In *City News*, a store selling sexually explicit materials challenged a city's decision to refuse to renew the store's adult business license.  After the denial withstood judicial review in the state courts, the Supreme Court granted certiorari to review the store's claims, but two months after petitioning for review before the Court, the store "gave notice that it would withdraw its renewal application and close

- 11 -

its business upon the City's grant of a license to another corporation." *Id.* at 282-83.  Thereafter, the store neither "pursue[d] nor currently expresse[d] an intent to pursue a license." *Id.* at 283.

Based on those facts, the Supreme Court rejected the store's contention that the case remained fit for adjudication because "it ha[d] never promised not to apply for a license in the future." *Id.* (quotation marks omitted).  In doing so, the Court distinguished *Pap's*, stating that although the Court in *Pap's* had reached the conclusion that the controversy persisted, even though the adult business had shut down, in part because the business "could again decide to operate," *id.* (quoting *Pap's*, 529 U.S. at 287), "[t]hat speculation standing alone, however, did not shield the case from a mootness determination." *Id.*  The *City News* Court explained that "[a]nother factor figured prominently" in *Pap's*, specifically that in *Pap's*, it was the plaintiff business that sought to have the case declared moot after the business had obtained a state-court judgment invalidating Erie's ordinance.  Had the Court in *Pap's* found the case to be moot, "the defendant municipality would have been saddled with an 'ongoing injury,' *i.e.*, the judgment striking its law[, a]nd the plaintiff arguably would have prevailed in an 'attemp[t] to manipulate the Court's jurisdiction to insulate a favorable decision from review.'" *City News*, 531 U.S. at 284 (quoting *Pap's*, 529 U.S. at 288).

In *City News*, in contrast, there was "no parallel circumstance," since the plaintiff business "left the fray as a loser, not a winner," so that the Court's dismissal of the writ of certiorari "d[id] not keep Waukesha under the weight of an adverse judgment, or deprive Waukesha of its victory in state court." *Id.*  In addition, the Court stated, "a live controversy is

not maintained by speculation that City News might be temporarily disabled from reentering a business that City News has left and currently asserts no plan to reenter." *Id.* at 285.

Applying these principles, other courts have held that mootness in the context of a defunct or moribund business depends in part on whether the business owner has indicated an intention or desire to resume operations if the governmental action at issue is successfully challenged. *Compare White River Amusement Pub*, 481 F.3d at 168 (although nude-dancing establishment was destroyed by fire, its operator's challenge to ordinance prohibiting public nudity was not moot, since operator "expressed a clear intent to reopen" the establishment in the future and had a renewable lease on the premises, which it did not intend to terminate); *Southern Oregon Barter Fair v. Jackson County, Oregon*, 372 F.3d 1128, 1134 (9th Cir. 2004) (claim by event organizer that state permit requirement violated First Amendment was not moot, even though plaintiff had not actually held a major event for several years because it lacked funding and an appropriate site, since plaintiff had "attempt[ed] to raise funds ... and ... ha[d] continued to seek a site" for its event; noting that "[t]his proceeding would be moot if the Fair had entirely ceased to operate, left the business, and no longer sought or intended to seek a license"), *cert. denied*, ___ U.S. ___, 126 S.Ct. 367 (2005); *Skysign Int'l, Inc. v. City and County of Honolulu*, 276 F.3d 1109, 1114 (9th Cir. 2002) (action challenging ordinance was not moot where plaintiff's "complaint fairly c[ould] be read to allege that the challenged ordinance itself is what caused it to cease operations, and that the removal of that obstacle would put it back in business"); *Clark v. City of Lakewood*, 259 F.3d 996, 1012 (9th Cir. 2001) (owner of closed adult businesses still had a legally cognizable interest in the outcome of his lawsuit sufficient to allow him to seek

injunctive relief, since his stated intention was to return to business); *Dolls, Inc. v. City of Coralville, Iowa*, 425 F.Supp.2d958, 986 (S.D.Iowa 2006) (action by adult-oriented business challenging constitutionality of licensing and zoning ordinances regulating such businesses, even though business owned no land zoned for adult-oriented businesses, and had neither applied for, nor been denied, a permit, since it was still incorporated and possessed a liquor license, and its owner expressed a "firm, conclusive, and unwavering" desire to continue operating as an adult dance establishment); *with Board of License Commissioners of the Town of Tiverton v. Pastore*, 469 U.S. 238, 239 (1985) (dismissing writ of certiorari as moot where establishment that had sought to challenge revocation of its liquor license had gone out of business, so that "no decision on the merits by this Court can now have an effect on the [establishment's] liquor license"); *Bumpus v. Clark*, 702 F.2d 826, 827 (9th Cir. 1983) (action by residents of nursing home challenging closure of home was moot where residents had all been removed prior to closure and transferred to other facilities, since "the subject matter of the action [was] inextricably tied to the existence and continued operation of" the home, "[n]o decree by the district court granting injunctive or declaratory relief c[ould] undo the closure, specify procedures for closing, or prevent the transfer of plaintiffs," and "[p]laintiffs did not request reopening of the home").

        In the case at bar, there is no indication that Beechwood could or would be reopened in the event that it prevails in this lawsuit.  Chambery has submitted two affidavits in connection with the pending motions, Dkt. #19(2), #27, and nowhere in either of them does he suggest that he plans to reopen Beechwood or a similar facility at any time in the future.

Most of Beechwood's other arguments why this case is not moot are equally unavailing. As for the alleged "name clearing" effect of a favorable ruling, "'reputational harm' does not rise to the level of the kinds of concrete disadvantages or disabilities that the Supreme Court has found constitute sufficiently adverse collateral consequences to render a case justiciable ... ." *Kundrat v. Halloran*, 206 F.Supp.2d 864, 869 (E.D.Mich. 2002) (citing *Spencer v. Kernna*, 523 U.S. 1, 8 (1998)).  That is particularly so in light of the fact that Beechwood is no longer in business; any name-clearing effect would have no practical impact whatsoever.  *See Spencer*, 523 U.S. at 18 ("We are not in the business of pronouncing that past actions which have no demonstrable continuing effect were right or wrong"); *North Dakota Rural Dev. Corp. v. United States Dep't of Labor*, 819 F.2d 199, 200 (8th Cir. 1987) (holding that action seeking review of denial of federal grant under Job Training Partnership Act was rendered moot by imminent expiration of grant year, despite plaintiff's argument that vindication of its reputation prevented dismissal on mootness grounds, since decision in plaintiff's favor "could not address [plaintiff's] fundamental injury in this case–its bar from participation in the 1985-87 grant competition"); *see also Campbell v. Greisberger*, 80 F.3d 703, 706 (2d Cir. 1996) (district court would have been justified in declining to exercise jurisdiction over claim for declaratory judgment where "no practical consequences [would have] followed" from declaratory relief).

I am equally unpersuaded by Beechwood's assertion that the case is not moot based on possible "collateral consequences" of this litigation, specifically Beechwood's stated intention to use any declaratory relief issued by this Court as "additional circumstantial evidence" in its pending § 1983 action, or as a basis for bringing an action against DOH in the New York Court

of Claims, *see* Beechwood's Opposition Brief at 42-43.  Beechwood has cited no authority, nor

has the Court found any, standing for the proposition that a party may pursue an action simply for

the purpose of gaining a potential advantage in some *other* litigation.  In any event, if the issues

that plaintiff seeks to litigate in the instant case are truly relevant and important to Beechwood's

§ 1983 action, the plaintiffs in that action could presumably fully explore those issues in the

context of that action.

There is one respect, however, in which plaintiff's claims are not moot:  plaintiff's claims

for monetary relief.  *See, e.g., Fulton Corp. v. Faulkner*, 516 U.S. 325, 327 n. 1 (1996) (tax

refund issue survived repeal of relevant statute); *Havens Realty Corp. v. Coleman*, 455 U.S. 363,

370-71 (1982) (action for damages for alleged violation of Fair Housing Act survived mooted

injunctive relief claim; "Given respondents' continued active pursuit of monetary relief, this case

remains 'definite and concrete, touching the legal relations of parties having adverse legal

interests'") (quoting *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240-241 (1937); *Loyal Tire &*

*Auto Center, Inc. v. Town of Woodbury*, 445 F.3d 136, 150-51 (2[d] Cir. 2006) ("We have

acknowledged that 'a viable claim for damages generally avoids mootness of the action'")

(quoting *Cook v. Colgate Univ.*, 992 F.2d 17, 19, 21 (2[d] Cir. 1993)); *Robert Pennza, Inc. v. City*

*of Columbus, Georgia*, 196 F.Supp.2d 1273, 1275 n. 3 (M.D.Ga. 2002) (although adult

entertainment establishment had gone out of business, lawsuit challenging local adult

entertainment code was not moot, "particularly given the fact that Plaintiffs seek damages

pursuant to their § 1983 claim for being forced out of business by Defendants' alleged

unconstitutional conduct").[6]  While the bulk of plaintiff's claims simply seek an order declaring

that certain of defendants' actions were unlawful, plaintiff has also advanced claims, specifically

those relating to the imposition of CMPs and the DPNA, that could provide a basis for monetary

relief if Beechwood were to prevail.  Insofar as plaintiff's claims could support its claims for

such monetary relief, then, they are not moot, and the Court will consider them.


## II. Standard of Review

Concerning the merits, a threshold question is what standard of review the Court should

apply to its review of the challenged CMS actions.  A related issue concerns the exact basis and

nature of plaintiff's claims.

The complaint alleges that the Court has jurisdiction under 42 U.S.C. §§ 405(g) and

1395cc(h)(1).  Section 405(g), a Social Security statute which has been incorporated into the

Medicare Act by § 1395cc(h)(1), *see Michigan Ass'n of Homes and Services for Aging, Inc. v.*

*Shalala*, 127 F.3d 496, 499 (6th Cir. 1997), generally provides for review of claims arising under

the Act.  *See also Yale-New Haven Hospital v. Leavitt*, 470 F.3d 71, 73 (2[d] Cir. 2006)

(addressing § 1395ff(b)(1), an analog to §1395cc(h)(1) dealing with claims by individual

Medicare beneficiaries); *Erringer v. Thompson*, 189 F.Supp.2d 984, 989 (D.Ariz. 2001)

(§1395cc(h)(1) "incorporates the judicial review procedures of 42 U.S.C. § 405(g)").  The

complaint also states, however, that defendants' actions are "subject to judicial review" not only

under §§ 405(g) and 1395cc(h)(1), but also under the Administrative Procedure Act ("APA"), 5

---

[6]At oral argument on the pending motions, defendants' attorney conceded that this case is
moot "except for the monetary aspect."  Tr. at 26.

U.S.C. § 702 *et seq.*, and under two nonexistent statutes, 28 U.S.C. §§ 2801-2802, which may be a typographical error intended to refer to the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202.  Complaint ¶ 2.

It is clear that *jurisdiction* in this case arises solely under § 405(g).  As the Supreme Court has noted, 42 U.S.C. § 1395ii incorporates into the Medicare Act § 405(h), which "channels most, if not all, Medicare claims through [the] special review system" set forth in § 405(g). *Shalala v. Illinois Council on Long Term Care*, 529 U.S. 1, 8 (2000); *accord Matthews v. Leavitt*, 452 F.3d 145, 153 n. 10 (2ᵈ Cir. 2006) ("§ 405(g) sets forth the sole means for judicial review of 'claim[s] arising under' the Medicare Act"); *see also Cathedral Rock of North College Hill, Inc. v. Shalala*, 223 F.3d 354, 358 (6ᵗʰ Cir. 2000) ("The Secretary's findings and decision to terminate participation in the Medicare program ... are subject to judicial review under § 405(g)"); *Life Source Enterprises, Inc. v. Shalala*, No. 00-CA-0902, 2000 WL 33348793, at *6-8 (W.D.Tex. Nov. 9, 2000) (holding that court lacked jurisdiction under APA to review HHS's suspension of plaintiff ambulance service provider's Medicare payments, and that "[t]he Medicare Act provides the sole means for review" of plaintiff's claims).[7]

---

[7]Although "[t]he Medicaid Act does not have a provision, such as § 1395ii in the Medicare Act, incorporating § 405(h) and its exclusive jurisdiction limitation to channel legal challenges through the administrative procedures set forth in § 405(g)," *Cathedral Rock*, 223 F.3d at 366, "the regulations provide that the appeals procedures set forth for reviewing the Secretary's determinations affecting participation in the Medicare program also apply to the Secretary's determination to terminate a nursing facility's Medicaid provider agreement." *Id.* (citing 42 C.F.R. §§ 498.3(a)(2)(i), 498.4).  Thus, "when a dually certified facility challenges a determination that it is not in substantial compliance with the common Medicaid and Medicare regulations and a termination of its participation in both programs, the facility must seek review of this determination" under § 405(g). *Id.*; *accord Health Equity Resources Urbana, Inc. v. Sullivan*, 927 F.2d 963, 967 (7ᵗʰ Cir. 1991).

The only real dispute in this regard concerns the proper scope and standard of the Court's review.  In general, when reviewing a final decision under § 405(g), the court is limited to "determin[ing] whether the correct legal standards were applied and whether substantial evidence supports the decision."  *Butts v. Barnhart*, 388 F.3d 377, 384 (2$^d$ Cir. 2004).  "Substantial evidence is 'more than a mere scintilla' and is 'such relevant evidence as [a] reasonable mind might accept as adequate to support a conclusion.'"  *Jasinski v. Barnhart*, 341 F.3d 182, 184 (2$^d$ Cir. 2003) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

Relying on § 405(g), defendants contend that the finding of Beechwood's noncompliance with federal requirements is supported by substantial evidence, and must therefore be upheld, and that this effectively ends the matter.  According to defendants, other issues, such as CMS's choice of remedies, simply cannot be reviewed at all.  *See* 42 C.F.R. § 488.408(g)(2) ("A facility may not appeal the choice of remedy, including the factors considered by CMS or the State in selecting the remedy ...").

Beechwood, on the other hand, contends that defendants' actions are subject to review under the standards of the APA.  At first blush, it might seem to make little difference whether that is so, since the APA also contains a "substantial evidence" standard for reviewing agency actions following an evidentiary hearing.  *See* 5 U.S.C. § 706(a)(2)(E); *Xiao Ji Chen v. United States Dep't of Justice*, 471 F.3d 315, 334 n. 13 (2$^d$ Cir. 2006) ("The 'substantial evidence' standard has its origins in the Administrative Procedure Act"); *Lifeline Ambulance Service, Inc. v. Leavitt*, No. 7:02-CV-1206 , 2006 WL 626177, at *4 (W.D.Va. Mar. 13, 2006) (stating that

§ 405(g) "incorporat[es] the deferential portion of the judicial standard of review contained in the Administrative Procedure Act").

The APA also provides, however, that a court may "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law ... ."  5 U.S.C. § 706(a)(2)(A).  Although "[r]eview under this provision is 'narrow,' limited to examining the administrative record to determine 'whether the [agency] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment,'" *Natural Resources Defense Council, Inc. v. Muszynski*, 268 F.3d 91, 97 (2ᵈ Cir. 2001) (quoting *City of New York v. Shalala*, 34 F.3d 1161, 1167 (2ᵈ Cir. 1994)), this language, if it does apply here, suggests a somewhat broader scope of review than that provided for by § 405(g).

Defendants' position, then, is that the Court's review is limited to determining whether CMS's "final decision" terminating Beechwood is supported by substantial evidence in the administrative record.  Beechwood contends that the Court may undertake a more searching review of the entire administrative process, *i.e.*, the means by which CMS arrived at its final decision, and that the Court's review is not limited to facts appearing in the administrative record.

In *Illinois Council*, 529 U.S. 1, the Supreme Court, though not discussing the APA, nonetheless provided some guidance with respect to the scope of review under § 405(g). Rejecting the plaintiff's argument that a claim arising under the Medicare Act need not be

"channeled" through the Act's administrative process with respect to claims that the agency

cannot or will not hear, the Court stated that

> [t]he fact that the agency might not provide a hearing for [a] particular contention, or may
> lack the power to provide one, ... is beside the point because it is the "action" arising
> under the Medicare Act that must be channeled through the agency.  After the action has
> been so channeled, the court will consider the contention when it later reviews the action.
> And a court reviewing an agency determination under § 405(g) has adequate authority to
> resolve any statutory or constitutional contention that the agency does not, or cannot,
> decide, including, where necessary, the authority to develop an evidentiary record.

*Id.* at 23-24 (citations omitted).  As examples of claims that cannot be heard at the administrative

level but that can later be raised on judicial review, the Court cited "decisions about a home's

level of noncompliance or a determination to impose one, rather than another, penalty."  *Id.* at 23.

In addition, the Second Circuit has stated that in an action under § 405(g), a court should

"review the Secretary's actions pursuant to the specific provisions of § 405(g) where applicable,"

and, "where no provision of § 405(g) is on point, ... apply the judicial review provisions of the

APA ... ."  *Yale-New Haven Hospital*, 470 F.3d at 78 (citing 5 U.S.C. § 559); *see also New York*

*Pub. Interest Research Group, Inc. v. Johnson*, 427 F.3d 172, 179 (2[d] Cir. 2005) ("Because the

[Clean Air] Act does not provide a standard of review, we review the EPA's actions under the

Administrative Procedure Act").  For example, in *Yale-New Haven Hospital*, the plaintiff

hospital, a Medicare provider, challenged a final decision of HHS denying coverage for a certain

type of treatment.  HHS based that decision on a rule that HHS had adopted altering its previous

Medicare reimbursement practices.  Since § 405(g) does not provide for judicial review of

administratively adopted rules, the Court of Appeals analyzed the rule relied upon by HHS under

the judicial review standards of the APA.  The court concluded that the rule had been adopted in

a manner that was arbitrary and capricious, and that the rule was therefore invalid and unenforceable.  *Id.* at 79, 86.

Taken together, *Illinois Council* and *Yale-New Haven Hospital* suggest several guiding principles.  First, *jurisdiction* in this case exists (as the complaint itself indicates) only under § 405(g), as incorporated into the Medicare Act by § 1395cc(h)(1).  That does not mean, however, that that Court is necessarily limited to reviewing only those matters actually decided by HHS, *i.e.*, the "final decision" itself, but may consider "any statutory or constitutional contention that the agency does not, or cannot, decide ... ."  Second, if § 405(g) does not provide a standard of review for a particular claim, the Court may look to other statutes, such as the APA, for guidance.


### III. Civil Money Penalties Imposed by the State DOH

### A. Insufficient Notice

On October 8, 1999, following a hearing which ran from June 23 until August 5, 1999, a State DOH  administrative law judge recommended that Beechwood's state operating certificate be revoked, and that CMPs be imposed in the amount of $54,000.  R. 1706.[8]  The DOH Commissioner adopted those recommendations on December 23, 1999.  Plaintiff's Statement of Facts (Dkt. #19-7) ¶ 106.

---

[8]"R." refers to the administrative record submitted by defendants in this case.  *See* Docket Entry, Aug. 12, 2005.

Beechwood contends that both the State DOH hearing and the imposition of the CMPs by DOH violated *federal* law.  In support of that contention, Beechwood relies on the following facts.

By letters dated May 7 and May 21, 1999, CMS informed Beechwood that CMS had accepted DOH's recommendation, based on recent DOH inspections of Beechwood, that Beechwood's Medicare and Medicaid participation be terminated.  CMS did not propose to impose any CMPs. CMS stated that termination was scheduled for June 17.  CMS also stated that it was imposing a DPNA effective upon receipt of the May 21 letter.  R. 238.

In a letter dated May 22, 1999, Beechwood informed CMS that Beechwood was demanding a hearing a before a federal ALJ in response to CMS's letters, pursuant to 42 C.F.R. § 498.40.  R. 226.  Once it made that demand, Beechwood argues, only CMS (and federal courts, on later review of CMS) had jurisdiction to consider and review the allegations of noncompliance and any ensuing remedies.  In other words, a hearing before CMS should have foreclosed any parallel state proceedings, at least until the federal administrative process was concluded.  Beechwood contends that "DOH ventured far beyond its authority" in conducting a hearing on the allegations of noncompliance, which according to Beechwood were within the purview of CMS.  Plaintiff's Brief (Dkt. #19-8) at 44.  Beechwood also alleges that the State DOH's subsequent imposition of CMPs on Beechwood also exceeded its statutory authority, and should be declared unlawful by this Court.

Central to this argument is Beechwood's contention that, notwithstanding the fact that the CMPs were imposed by DOH, *a state agency*, they were in effect federal remedies, which

triggered federal appeal rights, Beechwood's exercise of which should have taken precedence over any state administrative procedures.  In support of that argument, Beechwood relies on several HHS regulations dealing with remedies for noncompliance with Medicare and Medicaid program requirements.

First, 42 C.F.R. § 498.3(13) provides that "CMS makes initial determinations with respect to [certain] matters," one of which is, with respect to a skilled nursing facility, "a finding of noncompliance that results in the imposition of a remedy specified in § 488.406 of this chapter ... ."  Section § 488.406 lists a number of remedies that are available for noncompliance, and states that in addition to those specified remedies, "[a]lternative or additional state remedies approved by CMS" may be imposed.  Finally, § 488.408(g) provides that a "facility may appeal a certification of noncompliance leading to an enforcement remedy," although it adds that a "facility may not appeal the choice of remedy, including the factors considered by CMS or the State in selecting the remedy ... ."

Beechwood takes the position that the CMPs imposed by the State DOH were an "alternative or additional" state remedy approved by CMS, which entitled Beechwood to an appeal before CMS to adjudicate the factual basis for the CMPs.  Beechwood contends that by going ahead with its own enforcement proceedings before a CMS appeal had taken place, DOH caused an improper overlap of federal and state enforcement efforts, which ultimately led to Beechwood receiving less than a full review of the deficiency findings on its CMS appeal. Beechwood alleges that CMS "failed to control [DOH's] action," Plaintiff's Brief at 40, which

led to an improperly limited CMS hearing that was little more than a "rehashed" version of the DOH hearing.  *Id.*

In response, defendants argue that the CMPs were imposed by New York State for violations of state law only, and that neither CMS nor this Court has jurisdiction to review those penalties.  Defendants point out that the notice of hearing issued to Beechwood by the State DOH stated that the DOH hearing would "relate to alleged violations of Article 28 of the [New York] Public Health Law and Title 10 (Health) of the New York Code, Rules and Regulations," R. 1836, and that none of the documents from the state administrative proceedings cited New York's State Medicaid Plan ("State Plan") or the Medicaid statute, or expressly linked the CMPs to violations of that statute.[9]

It is at least questionable whether it is even necessary for the Court even to reach the question of whether the CMPs were simply state-imposed remedies under state law, or whether

---

[9]The documents also did not cite the Medi*care* statute, but that fact is unremarkable, since Medicare is administered by the federal government, not the states, whose Medicare role is largely limited to making recommendations to CMS as to whether surveyed facilities are Medicare compliant and deserve certification.  *United States ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1353 n. 11 (11th Cir. 2006).  In contrast, "[t]he federal and state governments share the cost of Medicaid roughly equally, but state governments administer the program ...," *Connecticut Dept. of Social Services v. Leavitt*, 428 F.3d 138, 141 (2d Cir. 2005), pursuant to state Medicaid plans that have been approved by CMS.  *Rabin v. Wilson-Coker*, 362 F.3d 190, 192 (2d Cir. 2004).  Both "[t]he Medicare and Medicaid Acts impose common certification and quality of care requirements on nursing facilities," however, *Cathedral Rock of North College Hill, Inc. v. Shalala*, 223 F.3d 354, 366 (6th Cir. 2000), and "[w]here the Secretary finds that a dually certified nursing facility is not in compliance with these requirements, it has authority to impose remedies on the facility, including termination, under both the Medicare and Medicaid Acts."  *Id.*; *see also* 42 C.F.R. § 488.406(d) (providing that "[i]f the State's remedy is unique to the State plan and has been approved by CMS, then that remedy, as imposed by the State under its Medicaid authority, may be imposed by CMS against the Medicare provider agreement of a dually participating facility").

they were "additional state remedies" approved by CMS for Medicare and Medicaid purposes,

since the entity that imposed the penalties, the State DOH, is *not* a party to this lawsuit.  Even if

the State DOH overstepped its authority in proceeding with a hearing and imposing CMPs while

Beechwood's federal administrative appeal was pending, it is difficult to see how *CMS* could be

held liable for that in this action.  Indeed, Beechwood states in its reply brief that if this Court

declares the CMPs to be invalid, "the actual recoupment of the money from DOH will be a

matter to be pursued by Beechwood in the New York Court of Claims."  Dkt. #26 at 12 n. 12.

*See also* Plaintiff's Opposition Brief (Dkt. #29-1) at 42 (stating that "this recovery will not occur

in this action, but in some subsequent litigation" between Beechwood and DOH or New York

State).  Although Beechwood contends that this claim is not moot because it involves a claim for

monetary relief, then, in fact Beechwood does not seek such relief *in this action*, nor, apparently,

could it, since the entity that imposed the CMPs, DOH, is not a party to this litigation.[10]

------

[10]In support of its assertion that this claim is not moot, Beechwood cites *British Caledonian Airways Ltd. v. Bond*, 665 F.2d 1153 (D.C. Cir. 1981), in which the District of Columbia Circuit held that the plaintiff foreign airlines' petition for review of an order of the Federal Aviation Administration prohibiting the operation of all DC-10 airplanes within United States airspace was not moot, even though the FAA had since terminated the order in question, because there was a reasonable expectation that the petitioners would be subject to the same action again.  *Id.* at 1158.  In a footnote, the court added that

> [t]he foreign airlines intend to take any judgment in their favor to the Court of Claims in an attempt to recover money damages.  The government contends that under these circumstances any opinion we might render on the merits would be purely advisory.  We do not agree for two reasons.  First, the Court of Claims is expressly prohibited by statute from entertaining actions based on or inextricably bound up with alleged violations or international agreements.  Second, under 49 U.S.C. § 1486(a) (1976), the courts of appeals have exclusive jurisdiction to review orders of the FAA Administrator.  Thus, although it is now impossible for us to reverse the actions of the Administrator through injunctive relief, the remaining consequences of the litigation (i.e., the possibility of

(continued...)

Aside from this issue, Beechwood's claim concerning the CMPs fails on the merits as well.  Beechwood litigated this issue in its federal administrative appeals before the DAB, which, in both its April 11, 2002 and January 23, 2004 decisions, held that the penalties imposed by the State DOH were *not* federal remedies entitling Beechwood to a federal administrative appeal.  I agree with that conclusion.

---

[10](...continued)
obtaining money damages concerning which we express no opinion) also prevent us from holding that this case is moot.

*Id.* at 1158 n. 2 (citation omitted).

*British Caledonian Airways* is distinguishable from this case in at least two respects, however.  First, the defendant in *British Caledonian Airways* was the FAA, an arm of the United States government, which could later be subject to suit in the Court of Claims.  Defendants in the case at bar are HHS and CMS, federal agencies that are not subject to suit in the New York Court of Claims.  The other two cases cited by Beechwood, *Powell v. McCormack*, 395 U.S. 486 (1969), and *Connaire, Inc. v. Secretary, United States Dep't of Transp.*, 887 F.2d 723 (6th Cir. 1989), likewise both involve the effects of equitable relief in one action on subsequent litigation between the *same parties*.  *Powell*, 395 U.S. at 499; *Connaire*, 887 F.2d at 725 (stating that "a decision here could affect future litigation arising out of the government's actions *in this case*") (emphasis added).  None of these cases, then, stand for the proposition that a plaintiff may seek purely declaratory relief against a party simply to provide ammunition for subsequent litigation against a *different* party.

Second, Beechwood has not shown either that the New York Court of Claims would be prohibited from entertaining its claims against DOH in the first instance, or that this Court has exclusive jurisdiction to consider Beechwood's claim concerning DOH's imposition of CMPs.  There is no indication, then, that anything would prevent Beechwood from fully litigating the merits of this claim in the New York Court of Claims, with or without a prior declaratory judgment from this Court.  *See, e.g.*, *Parsa v. State of New York*, 64 N.Y.2d 143, 150 (1984) (Court of Claims would have jurisdiction to hear claim for reimbursement of Medicare moneys withheld by the State in alleged violation of certain federal statute); *Park v. State*, 13 Misc.3d 1238 (N.Y. Ct. Cl. 2006) (decision following trial of claim for monies allegedly due in connection with claimants' involvement with Medicaid program).

First, the State DOH CMPs were neither explicitly nor implicitly approved by CMS, nor were they imposed by DOH on behalf of CMS.  CMS regulations provide a number of remedies short of termination of the provider agreement for noncompliance with Medicare and Medicaid program requirements.  Those remedies, which generally may be imposed by either CMS or the relevant state agency, are grouped into three categories.  *See* 42 C.F.R. § 488.408.  Category 1 remedies include a directed plan of correction, state monitoring, and directed in-service training.  42 C.F.R. § 488.408(c).  Category 2 remedies include denial of payment for new admissions, denial of payment for all individuals, CMPs of $50 to $3,000 per day, and CMPs of $1,000-$10,000 per instance of noncompliance.  42 C.F.R. § 488.408(d).  Category 3 remedies include temporary management, immediate termination, CMPs of $3,050-$10,000 per day, and CMPs of $1,000-$10,000 per instance of noncompliance.  42 C.F.R. § 488.408(e).

Section 7314 of the CMS State Operations Manual provides that "[b]efore the State provides formal notice of the imposition of a category 1 remedy ..., as authorized by CMS and/or the State Medicaid Agency ["SMA"], the State notifies the [CMS] regional office and the [SMA] of its proposed action."  If neither the regional office nor the SMA indicates its disapproval of the proposed category 1 remedy, the State sends a letter to the facility "providing notice 'as authorized by CMS and/or the [SMA],' (as appropriate)" that a category 1 remedy is being imposed, and a "State official signs the letter on behalf of the regional office and/or" SMA.

Thus, with respect to category 1 remedies (which do not include CMPs), CMS approval of the state's action is implied, absent express disapproval by CMS.  No comparable provision exists with respect to category 2 or 3 remedies (which do include CMPs), and there is no

evidence that the State DOH gave CMS notice of its intention to seek to impose CMPs on

Beechwood, or that CMS expressly approved those CMPs.

In addition, though the regulations do provides for CMPs as category 2 and 3 remedies,

they also provide that "these remedies are in addition to any others available under State or

Federal law ... ." 42 C.F.R. § 488.400.  Thus, a state's imposition of a remedy does not

necessarily mean that the remedy was imposed under federal law, much less that the remedy was

imposed on behalf of, or with the approval of, CMS.  A state participating in the Medicare and

Medicaid programs remains free to take action under state law as well.  That is precisely what

happened in this case.

In that regard, New York's State Plan states that "New York provides under Section 12 of

the [New York] Public Health law a civil money penalty system" under which a "facility may be

fined up to $2000 for the one time occurrence of any violation of state requirements ... ."  R.

1425.  *See* Pub. Health L. § 12(1) ("Any person who violates, disobeys or disregards any term or

provision of this chapter or of any lawful notice, order or regulation pursuant thereto for which a

civil penalty is not otherwise expressly prescribed by law, shall be liable to the people of the state

for a civil penalty of not to exceed two thousand dollars for every such violation").  These CMPs

are described as an "additional remedy," and thus are clearly not considered to be the same as, or

equivalent to, the federal CMPs provided for by § 488.408 of the federal regulations.  Although

Beechwood notes that the State Plan was approved by CMS, that is beside the point.  The fact

remains that the State Plan provides for CMPs as an "additional remedy" imposed by the State

DOH under state law, not federal law.  CMS's approval of the *plan* does not convert every

*remedy* imposed by DOH pursuant to that plan into a federal remedy.

The record in this case also demonstrates that the CMPs at issue here were imposed  by

the State  DOH under state law.  The state ALJ concluded that Beechwood's "main objection" to

the charges against it was "that the notice of hearing fail[ed] to give notice to [Beechwood] of the

specific statutory section" under which DOH was basing that proceeding.  R. 1835.  Addressing

that objection, the State ALJ made clear that the proceeding arose under Article 28 of the New

York Public Health Law and Title 10 of the New York Codes, Rules and Regulations.  R. 1836.

The ALJ noted that the notice of hearing also referenced those provisions.  *Id.*

In addition, the State ALJ noted that the State DOH sought "a civil penalty of $94,000 for

47 separately identified violations of 10 NYCRR Part 415," *i.e.*, $2000 per violation.  R. 1839.

That is the penalty set forth in § 12 of the Public Health Law, which is the basis for the

"additional remedy" provided for in New York's State Plan.

In short, the CMPs imposed by the State DOH were imposed by a state agency under state

law.  They cannot be attributed to CMS, which neither imposed nor approved them.  Those

penalties did not give rise to any *federal* appeal rights, and CMS did not wrongfully "fail[] to

control its agent" DOH, as plaintiff alleges, by somehow stepping in and ordering a halt to the

DOH hearing.  For the same reasons, Beechwood did not have a right, in the federal

administrative hearing, to challenge, and obtain a ruling from CMS on, every one of the

allegations of noncompliance underlying the CMPs imposed by the State DOH.

Finally, I note that Beechwood had available to it an avenue of relief from those state-imposed penalties in the state courts, which it failed to pursue.  As explained in my prior decision in Beechwood's § 1983 action,  Beechwood filed an Article 78 petition in New York State Supreme Court, Monroe County, on February 28, 2000, seeking, *inter alia*, a declaration that the State DOH administrative proceeding, the DOH ALJ's report, and the DOH's December 23 order imposing CMPs and revoking Beechwood's operating certificate were null and void.

Pursuant to C.P.L.R. § 7804(g), the judge presiding over the Article 78 proceeding issued an order transferring the proceeding to the Appellate Division, but for reasons that are unclear, that transfer never occurred.[11]  Beechwood never pursued the matter further though.  In the § 1983 action, Beechwood and the Chamberys "candidly admit[ted] ... that they had "no incentive to press" the Article 78 proceeding, for a number of reasons, including the fact that Beechwood had already been closed and, the unavailability of damages in an Article 78 proceeding, and the possibility that the state court's rulings on the issues presented in the Article 78 petition might be given collateral estoppel effect in any later actions initiated by plaintiffs.  317 F.Supp.2d at 260.

As I stated in my decision in the § 1983 action,

> plaintiffs themselves chose not to make full use of the procedures that were available to them.  They could have, and in fact did, commence an Article 78 proceeding to review the outcome of the DOH hearing, but by their own admission, plaintiffs chose not to pursue it.  Even if plaintiffs believed that the result of the DOH hearing had been preordained, they had no reason to think, nor do they now contend, that the same would

---

[11]Section 7804(g) provides that where an issue is raised concerning whether a determination made as a result of an administrative evidentiary hearing is supported by substantial evidence, the Article 78 proceeding must be transferred for disposition to a term of the appellate division, unless the court in which the petition was filed can terminate the proceeding by ruling on other objections to the proceeding, such as lack of jurisdiction, statute of limitations and res judicata, without reaching the substantial evidence issue.

> have been true of the Article 78 proceeding.  ... [P]laintiffs can hardly be heard to
> complain that they were not given a full and fair opportunity to contest the issues here
> when they did not fully avail themselves of the opportunities that *were* open to them.

*Id.* at 268-69.  I also noted that "plaintiffs ... certainly could have raised their constitutional

claims," and "in fact did assert ... such claims in their Article 78 proceeding," including "their

'federal primacy' claim that it was improper for the State DOH to conduct a hearing prior to the

completion of the federal administrative proceeding."  *Id.* at 269-70.

In its partial affirmance of this Court's decision concerning Beechwood's § 1983 claim

against various state actors, the Second Circuit also noted that Beechwood had a meaningful

remedy available to challenge the State actions in the Article 78 proceeding.  If successful, that

remedy could have rectified all that plaintiff now claims to be error.  *See  Beechwood*, 436 F.3d

at 156-57 (stating that an Article 78 proceeding "afforded a meaningful post-deprivation remedy

for Appellants' claimed violation," and that "[i]n an Article 78 proceeding, Beechwood could

have argued that [DOH's] license suspension 'determination was made in violation of lawful

procedure, was affected by an error or law or was arbitrary and capricious or an abuse of

discretion,' and if Beechwood prevailed, the establishment approval could have been reinstated,

or a hearing ordered") (quoting N.Y. C.P.L.R. § 7803).


**IV. Denial of Payment for New Admissions**

By letter dated May 7, 1999, CMS informed Beechwood that based on the State DOH's

deficiency findings in its recent surveys of Beechwood, Beechwood's "Medicare provider

agreement will terminate on May 15, 1999," unless the deficiencies were corrected by that date,

or the level of seriousness decreased.  R. 1427.  CMS also stated that "[t]he Medicare program will not make payment for residents who are admitted on or after May 15, 1999."

In a letter dated May 21, 1999, CMS stated that based on a May 12 revisit by DOH, "it was determined that the immediate jeopardy has been removed, and the termination action is being rescinded as of that date."  R. 238.  The letter added, however, that "due to the seriousness of the deficiencies still remaining, the termination of your Medicare provider agreement has been rescheduled for June 17, 1999 unless the deficiencies are corrected by that date.  In addition, a ban on payment for new Medicare and Medicaid patients is being imposed *as of the date of the receipt of this letter.*"  *Id.*  (Emphasis added.)

Beechwood states that even after the DPNA was imposed, it continued to accept some new patients covered by the Medicare and Medicaid programs, in part because it had already made commitments to those patients and their families, and to the hospitals from which those patients were discharged.  Dkt. #19 ¶¶ 64-66.  Beechwood billed CMS for services rendered to those patients in May and June, and CMS initially paid Beechwood about $51,000 for such services.  *Id.* ¶ 68.  CMS later rescinded those payments, however.  *Id.*  Beechwood also alleges that there were some patients for whom Beechwood did not bill CMS, because it had become apparent that CMS was unwilling to make further payments.[12]

Beechwood contends that the DPNA was unlawfully imposed, for a number of reasons. Beechwood therefore contends that "CMS owes Beechwood at least $95,694.39," plus interest, for Medicare patients admitted on or after May 21, 1999.

---

[12]Beechwood's last day of operations was July 16, 1999.

First, Beechwood alleges that the May 21 letter did not comply with the regulatory provision that "[e]xcept for civil money penalties and State monitoring, notice must be given at least 15 calendar days before the effective date of the enforcement action in situations in which there is no immediate jeopardy."  42 C.F.R. § 488.402(f)(4).  Since the May 21 letter stated that a DPNA was being imposed as of the date of Beechwood's receipt of the letter, Beechwood argues, the DPNA was invalid.

In response, defendants contend that the May 7 letter first put Beechwood on notice of the forthcoming DPNA.  As stated, the May 7 letter had stated that "[t]he Medicare program will not make payment for residents who are admitted on or after May 15, 1999," although it appears that in fact no DPNA was imposed until after the May 21 letter was sent.[13]

There are several problems with defendants' argument, however.  First, the May 7 letter did not provide notice of an impending DPNA; it provided notice of the complete termination of Beechwood's provider status.  When read in context, the letter's reference to payments not being made for residents admitted on or after May 15 was not intended to provide notice of a DPNA as a separate remedy in addition to the termination (which would have rendered such an additional remedy superfluous), but as an explanation of the *consequences* of the termination.  This

---

[13]For reasons that are unclear, the May 7 letter was addressed to Beechwood at "900 Culver Road, Poughkeepsie, NY 12601," R. 1427.  There appears to be no dispute that Beechwood did receive this letter however; in a letter to HCFA dated May 28, 1999, Beechwood's attorney stated, "By letter dated May 7, 1999, your office informed Beechwood" of alleged deficiency findings, and "imposed a ban on payment for new admissions of residents admitted after May 15, 1999."  R. 2072.  *See also* Plaintiff's Brief (Dkt. #19-8) at 49 (referring to "a CMS letter Beechwood received ... on May 7").

An amended notice was sent to Beechwood on May 11, 1999, with the correct address of "900 Culver Road, Rochester, NY 14609."  R. 240.  The May 11 letter contained exactly the same language about nonpayment for residents admitted on or after May 15 as the May 7 letter.

conclusion is reinforced by the letter's additional statement that payments would continue to be made for up to thirty days for residents admitted before May 15; federal regulations provide that "[p]ayment is available for up to 30 days after the effective date of termination for ... [i]npatient hospital services ... and posthospital extended care services furnished to a beneficiary who was admitted before the effective date of termination."  42 C.F.R. § 489.55(a).

The May 7 letter also stated that "[a] change in the seriousness of [Beechwood's] noncompliance to non-immediate jeopardy may result in a change in *the remedy* selected.  If this occurs, *you will be notified of any change in the remedy*."  R. 1427 (emphases added).  That suggests, first, that only one remedy–termination–was being imposed, and that if that remedy were changed, *e.g.*, to a DPNA, Beechwood would receive notice of the change, presumably in compliance with any applicable notice requirements.

I also note that on May 13, 1999,  HCFA published a notice in the Rochester *Democrat and Chronicle* newspaper stating that HCFA had "determined that the Beechwood Sanitarium is not in compliance with the Medicare Requirements for Long Term Care Facilities," that Beechwood's provider status would be terminated on May 15, 1999, and that "[p]ayment for inpatient skilled nursing services rendered to beneficiaries admitted prior to May 15, 1999 will be made for up to 30 days after May 15, 1999."  R. 1430.  Two days later, however, on May 15, HCFA published another notice in the *Democrat and Chronicle* stating that the scheduled termination "is being rescinded" and that HCFA "has determined that the Beechwood Sanitarium is now in compliance with the Medicare Requirements for Long Term Care Facilities."  R. 1433.  That would seem to imply that whatever actions that HCFA had previously planned to take

against Beechwood had been rescinded, and that no further action was being contemplated, at least until further notice.[14]

I conclude, then, that the May 21 letter constituted the first notice that Beechwood received concerning the DPNA.[15]  Since the letter purported to notify Beechwood that the DPNA was being imposed immediately upon receipt of the letter, it plainly did not comply with the 15-day notice requirement of 42 C.F.R. § 488.402(f)(4).  The question, then, is whether that untimeliness entitles Beechwood to a remedy in this action and if so, what that remedy should be.

At the outset, I note that defendants' failure to give 15 days' notice of the DPNA as provided for in the regulations does not necessarily give rise to a constitutional due process violation.  *See Stieberger v. Apfel*, 134 F.3d 37, 39 (2[d] Cir. 1997) ("notice is constitutionally sufficient if it is reasonably calculated to reach and inform the person entitled to be notified."); *Tolchin v. Supreme Court of the State of New Jersey*, 111 F.3d 1099, 1115 (3[d] Cir. 1997) ("An agency's failure to follow its rules and regulations, however, is not a per se violation of due process") (citing *United States v. Caceres*, 440 U.S. 741 (1979)); *Concourse Rehab. & Nursing*

---

[14]The record also contains a copy of a letter dated May 28, 1999, from Beechwood's attorney to the HCFA, stating in part that "[o]n May 14, 1999 you confirmed in a telephone conversation with myself and [co-counsel], that the immediate jeopardy status had been lifted and that payments would continue for new admissions."  R. 2072.  Although this is hearsay, "a court deciding a motion for summary judgment ... can consider hearsay upon 'a showing that admissible evidence will be available at trial.'"  *Sadki v. Suny College at Brockport*, 310 F.Supp.2d 506, 517 (W.D.N.Y. 2004) (quoting *Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.*, 769 F.2d 919, 924 (2[d] Cir. 1985)).  I need not rely on this evidence in order to decide the pending motions, and accordingly I find it unnecessary to decide whether that test has been met here.  I do note, however, that defendants do not appear to dispute the accuracy of this statement concerning the substance of the May 14 conversation.

[15]As noted above, the "amended" notice sent on May 11 differed from the May 7 notice only insofar as it contained Beechwood's correct mailing address.

*Ctr., Inc. v. Thompson*, No. 03 Civ.260, 2004 WL 434434, at *5 (S.D.N.Y. Mar. 8, 2004) ("That HHS imposed sanctions three days before it should have done so [*i.e.*, 12 days after giving notice] does not approach the level of a due process violation") (citing *Snowden v. Hughes*, 321 U.S. 1, 15 (1944)).  Beechwood apparently recognizes that, as it has expressly disavowed any claim of constitutionally insufficient notice.  *See* Dkt. #26 at 15.  Rather, Beechwood premises this claim on the APA, which provides that a court reviewing an agency's action shall "hold unlawful and set aside agency action, findings, and conclusions found to be ... without observance of procedure required by law."  5 U.S.C. § 706(2)(D).  Beechwood contends that pursuant to its authority to "set aside" such agency actions, the Court should simply declare the DPNA invalid and ineffective.

The United States Supreme Court has recognized that "[a]gency violations of their own regulations, whether or not also in violation of the Constitution, may well be inconsistent with the standards of agency action which the APA directs the courts to enforce."  *Caceres*, 440 U.S. at 754; *see also Wilson v. Commissioner of Social Sec.*, 378 F.3d 541, 545 (6th Cir. 2004) ("The Supreme Court has long recognized that a federal agency is obliged to abide by the regulations it promulgates") (citing *Vitarelli v. Seaton*, 359 U.S. 535, 545  (1959); *Service v. Dulles*, 354 U.S. 363, 372 (1957); *Accardi v. Shaughnessy*, 347 U.S. 260, 267 (1954)); *Sierra Club v. Flowers*, 423 F.Supp.2d 1273, 1285 (S.D.Fla. 2006) ("The failure of an agency to comply with its own regulations constitutes arbitrary and capricious conduct") (quoting *Simmons v. Block*, 782 F.2d 1545, 1550 (11th Cir. 1986)); *Malladi v. Brown*, 987 F.Supp. 893, 923 (M.D.Ala. 1997) ("The procedure required by law [for purposes of the APA] is determined by the statutes and

regulations under which the agency's action was taken.  The agency is bound by the terms of the regulations it enacts according to Congressional authority, because validly enacted regulations have the force of law") (citing *Chrysler Corp. v. Brown*, 441 U.S. 281, 295 (1979)).

Since the applicable regulation requires 15 days' notice of an enforcement action in which there is no immediate jeopardy, the May 21 letter stating that a DPNA was being imposed upon receipt of that letter plainly did not comply with the notice requirement, and hence may be "set aside" under the APA.  That does not necessarily mean, however, that the notice must or should be completely invalidated.

"In devising an appropriate remedy [pursuant to the APA], the words 'set aside' need not be interpreted narrowly.  The Court may tailor its remedy to the unlawful agency behavior." *Thompson v. U.S. Dep't of Housing and Urban Dev.*, 348 F.Supp.2d 398, 464-65 (D.Md. 2005) (citing *N.A.A.C.P. v. Secretary of Housing and Urban Development*, 817 F.2d 149, 160 (1st Cir. 1987)); *see also Indiana & Michigan Electric Co. v. FPC*, 502 F.2d 336, 346 (D.C. Cir. 1974)) ("[W]hile the court must act within the bounds of the statute and without intruding upon the administrative province, it may adjust its relief to the exigencies of the case in accordance with the equitable principles governing judicial action") (quoting *Ford Motor Co. v. NLRB*, 305 U.S. 364 (1939)).  On the facts before me, I conclude that simply to invalidate the DPNA in its entirety is unwarranted, and that the most equitable remedy would be to rule that the DPNA was not effective until 15 days after Beechwood received the May 21, 1999 letter.  Since it is undisputed that Beechwood received that letter by fax on May 21, *see* Complaint ¶ 92, the DPNA could not lawfully have taken effect until June 5, 1999.

Beechwood asserts that such an "adjustment" of the effective date of the DPNA is "unauthorized by the regulations" as well as inequitable, since it would "ignore[] the demonstrated havoc and economic consequences that the inadequate DPNA notice had on Beechwood." Dkt. #26 at 16. Beechwood contends that the Court should simply declare the DPNA invalid in its entirety in accordance with 5 U.S.C. § 706(2)(D) (providing that court reviewing agency action shall "hold unlawful and set aside agency action, findings, and conclusions found to be ... without observance of procedure required by law").

In fact, the regulations do not appear to prescribe any particular approach to follow when the agency has given insufficient notice of the imposition of a remedy. To say, then, that adjusting the effective date of the DPNA is "unauthorized" by the regulations does not answer the question of what remedy is appropriate, since the regulations are simply silent in that regard.

Although the imposition of a DPNA *upon receipt* of the May 21 notice was impermissible under the regulations, the May 21 letter did give Beechwood notice that a DPNA was going to be imposed. In other words, the problem here was one of untimely notice, not of lack of notice altogether. While Chambery may have believed that imposition of a DPNA without 15 days' notice was improper, *see* Chambery Aff. ¶ 64(a), he could not reasonably have simply ignored it altogether, or assumed that a DPNA would not or could not lawfully take effect fifteen days later.

It appears that the Chamberys, as well as plaintiff's counsel, did have some awareness that they might not be entitled to payments for new patients beginning on June 5, the fifteenth day after notice. The May 28, 1999 letter from Beechwood's attorney to HCFA states, in part,

that "based on your notification dated May 21, 1999, the earliest date HCFA can lawfully impose a ban on new admissions is June 5, 1999." R. 2073. In addition, Chambery states in his affidavit that "[b]etween May 21, 1999 and June 5, 1999, Beechwood accepted 13 Medicare patients into the facility ... ." Dkt. #19(2) ¶ 66. He adds that "[a]lthough I initially believed that Beechwood did not accept any Medicare patients after June 5, 1999, a review of Beechwood's records in preparation for this action revealed that Beechwood actually accepted five more Medicare patients between June 7, 1999 and June 12, 1999." *Id.* ¶ 71. The facts that Chambery initially believed that no new patients were accepted after June 5, and that although five more patients were accepted, the influx of new patients did quickly evaporate after that date, also suggest that Beechwood's proprietors were aware that a DPNA after June 5 was a very real possibility.

Regardless of what the Chamberys believed, however, on May 21, 1999 they were given notice of the imposition of a DPNA. That DPNA could not lawfully take effect for 15 days after that date, but I see no reason why it should simply be deemed a nullity. *Cf. Genstar Chemical Ltd. v. I. C. C.*, 665 F.2d 1304, 1309 (D.C. Cir. 1981) ("common sense ... suggest[s] that when a [rail] carrier effects a rate increase on less than the [statutory] notice period, the appropriate remedy would be to refund the charges collected during what should have been the notice period, not to treat the tariff as nonexistent"), *cert. denied*, 456 U.S. 905 (1982). Plaintiff is therefore entitled to summary judgment on its claim seeking to set aside defendants' imposition of a DPNA for insufficient notice, but only insofar as payment was denied for patients admitted prior to June 5, 1999.[16]

---

[16]Defendants do not expressly advocate such a remedy, since they contend that the May 7
(continued...)

Unless the parties can agree on the proper sum, the matter is remanded to CMS to calculate the proper payment to the Chamberys, the partnership that operated Beechwood, plus interest.

## B. Basis for DPNA

Aside from the issue of notice, Beechwood also challenges the propriety of the DPNA in a number of respects.  In its first cause of action, Beechwood alleges that the DPNA was imposed by CMS without having first obtained proper certifications and recommendations from the State DOH, and without CMS making its own findings or initial determinations as to Beechwood's compliance and the appropriateness of remedies to be imposed.  Similarly, the second cause of action alleges that CMS agreed to the DOH-recommended DPNA without having reviewed the May 1999 SOD prior to its issuance by the State DOH, and without having considered Beechwood's compliance with the directed plan of correction that had been imposed by CMS.  Beechwood's ninth claim also alleges that the federal ALJ's factual determinations underlying

---

[16](...continued) letter gave Beechwood sufficient notice of the DPNA.  I note, however, that the DAB implicitly endorsed such an approach in its decision on Beechwood's federal administrative appeal.  In its January 23, 2004 decision, the DAB stated that "assuming that the notice period should have excluded May 7th from the counting period so as to arrive at 14 days, we would not conclude that the DPNA was void.  Rather, at most, an adjustment for residents admitted on the day of May 21st would remedy any error. Since Beechwood did not specifically assert that it admitted any new residents on May 21st, we decline to order any such adjustment."  R. 132.  Although, given its use of the May 7 date and the lack of evidence that Beechwood accepted any patients on May 21, the DAB found it unnecessary to apply such an adjustment, it did thus indicate its belief that such a remedy would be appropriate had Beechwood accepted any new patients during what should have been the 15-day notice period.

the DPNA were not supported by substantial evidence and did not justify the imposition of a

DPNA.  The standard review is governed by  42 U.S.C. § 405(g) (providing that Commissioner's

findings "as to any fact, if supported by substantial evidence, shall be conclusive").

With respect to the sufficiency of the evidence, the ALJ's factual findings must be

affirmed if they are supported by substantial evidence.  *Veino v. Barnhart*, 312 F.3d 578, 586 (2$^{d}$

Cir. 2002); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2$^{d}$ Cir. 1991).  *See also* 42 U.S.C. § 405(g).

Substantial evidence is defined as "'more than a mere scintilla.  It means such relevant evidence

as a reasonable mind might accept as adequate to support a conclusion.'"  *Richardson v. Perales*,

402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229

(1938)).

The May 1999 survey by the State DOH identified nine deficiencies at Beechwood,

involving twenty-one different residents.  R. 3814-43.  On appeal, the federal ALJ reviewed and

upheld two of the deficiencies.

With respect to one of the deficiencies (F157), there was evidence before the ALJ that a

particular resident fell and hit her head on May 5, 1999, and was sent to a hospital the following

day after developing a headache, fever, and abdominal pain.  R. 21.  On May 8, a DOH surveyor

observed a family member visiting Beechwood express his concern that he had not been notified

of the transfer.  *Id.*  Beechwood apparently did not deny the lack of notification, but instead

raised various arguments concerning the surveyor's lack of certification and the correct definition

of "injury" in 42 C.F.R. § 483.10(b)(11)(A).  The ALJ rejected both of those arguments.  R. 21-

22.  The ALJ did agree with Beechwood that this evidence "show[ed] an isolated failure ... to

comply with participation requirements," but added that "the failure in this instance was not a simple error by [Beechwood's] staff that caused no potential for harm," and that it was "reasonable to infer that the failure to notify would have continued had the family member not complained."  R. 22-23.  The federal ALJ also stated that because the resident "was in the hospital isolated from her family" during this time, "[t]here was a substantial potential for the resident to suffer emotional harm during the hospitalization."  R. 23.  He concluded, and the DAB agreed, on appeal, that Beechwood was not in substantial compliance with the requirements of 42 C.F.R. § 483.10(b)(11), which requires a facility to "immediately" notify a resident's family member when a resident has been transferred outside the facility, or has been involved in an accident that results in injury and a "potential for requiring physical intervention."

With respect to the second area of deficiency (F281), the ALJ found that Beechwood was not in substantial compliance with 42 C.F.R. § 483.20(k)(3)(i), which requires a facility to provide services meeting "professional standards of quality."  In support of that conclusion, the ALJ relied on evidence concerning several residents.  One of these suffered from diabetes and an infection.  There was evidence that the resident's physician was not notified when the resident's blood glucose level equaled or exceeded 400 on several occasions in April 1999.  R. 3817.  In addition, on April 24, a prescribed antibiotic was not given to the resident for 31 hours, and the physician was not notified of the delay.  R. 3817-18.  In addition, the resident had an elevated temperature on May 1, but after an unsuccessful attempt to notify the physician, nursing staff made no follow-up calls until the next day.  R. 3818.  The nurse surveyor testified that these failures to notify did not meet professional standards of care.  R. 3872.

There was evidence that another resident was given oxygen on May 8, 9 and 10, 1999,

though there was no order for oxygen, and nothing in the medical record indicated that the

resident should have been given oxygen.  R. 29, 3821-22.  Nursing staff was unable to explain

why the resident was receiving oxygen, and no physician was notified of the oxygen

administration, contrary to Beechwood's policies.  R. 156, 3821.  A physician testified that

professional standards of care permitted staff to administer oxygen in an emergency without prior

physician approval, but that the physician must be notified afterwards.  R. 3932.

On May 2, 1999, Beechwood's nursing staff inserted a rectal tube into another resident

without a physician's order, in an attempt to relieve the resident's abdominal distention and

dyspnea.  R. 28, 3820-21.  A nurse surveyor and a physician testified that inserting a rectal tube

without a physician's order exceeded the scope of nursing practice.  R. 3873, 3932, 4032.

There was also evidence that another resident was admitted with an indwelling catheter

and a physician's order dated May 6, 1999, stating that the catheter could be removed after three

to four days.  R. 24, 3098.  On May 8, nursing staff observed the resident pulling at the catheter,

indicating that it was causing discomfort, but the catheter was not removed until May 12.  R.

2461.  A nurse told a surveyor that she had just become aware of the physician's order on May

12.  R. 24-25, 3817.

In this action, Beechwood stated that with respect to these residents, the federal ALJ's

conclusion that Beechwood had not met professional standards of care was a "hotly contested"

issue centering on what the proper standard of care actually was, and that no actual harm was

identified for any of these residents.  Dkt. #29-1 at 32-33.  Those are not the issues before me.

The question is whether substantial evidence supports the ALJ's factual findings.  The relevant facts themselves are generally undisputed, and in my view they adequately support the ALJ's findings.

I am also unpersuaded by Beechwood's argument that the ALJ improperly "cherry-picked" certain deficiency findings to review, and that he should have reviewed all of the deficiency findings. The relevant inquiry, though, is whether there was substantial evidence to support the deficiencies that were relied on by the ALJ.

Pursuant to 42 C.F.R. § 488.408(d)(2), CMS applies a category 2 remedy (including DPNA) when there are "[w]idespread deficiencies that constitute no actual harm with a potential for more than minimal harm but not immediate jeopardy ...," and may apply one or more category 2 remedies "to *any* deficiency" except when "[t]he facility is in substantial compliance," or certain CMPs are imposed, neither of which circumstances existed here.  Even if the other alleged deficiencies had been resolved in Beechwood's favor, that would not make the imposition of a DPNA improper.  *Cf. Northern Montana Care Center v. Leavitt*,  No. CV 04-97, 2006 WL 2700729, at *1 (D.Mont. Sept. 18, 2006) ("Without a recognized property interest in the continued participation in Medicare/Medicaid programs, NMCC cannot claim that the ALJ's decision not to rule on all of its deficiencies was a violation of due process.  Consequently, NMCC has not presented a cognizable claim"); *see also Harmony Court v. Leavitt*, 188 Fed.Appx. 438, 440 (6th Cir. 2006) ("Like the ALJ and the Board, we need not address each and every violation").

As to the other alleged procedural improprieties during the hearing process, I am equally unpersuaded that they require setting aside the DPNA.  These alleged procedural irregularities,

even if they occurred, were effectively cured by the extensive procedures afforded to Beechwood, which was allowed to any did present substantial evidence concerning the SODs.  Since the ultimate factual findings of the ALJ and CMS are supported by substantial evidence, these alleged procedural errors caused Beechwood no harm or prejudice.  *Cf. United States v. Mechanik*, 475 U.S. 66, 70 (1986) (holding that a petit jury's conviction renders any error in the grand jury's charging decision harmless).

The gist of plaintiff's claim is that defendants acted arbitrarily and capriciously in imposing a DPNA (as well as in terminating Beechwood's Medicare and Medicaid provider status, a claim that is now moot).  As stated, though, there was substantial evidence supporting the factual findings that formed the basis for the DPNA.  In light of the deferential standard of review applied by this Court, *see National Ass'n of Clean Air Agencies v. E.P.A.*, ___ F.3d ___, 2007 WL 1574609, at *6 (D.C. Cir.  June 1, 2007) ("The arbitrary and capricious standard [under the APA] is '[h]ighly deferential,' and it 'presumes the validity of agency action'") (quoting *AT & T Corp. v. FCC*, 349 F.3d 692, 698 (D.C. Cir. 2003)); *Hilkemeyer v. Barnhart*, 380 F.3d 441, 445 (8th Cir. 2004) ("Our review [under § 405(g)] is deferential; we may not substitute our judgment for that of the ALJ"), I cannot agree with plaintiff's contention in this regard.  *See Michigan Ass'n of Homes and Services for Aging, Inc. v. Shalala*, 127 F.3d 496, 501 (6th Cir. 1997) ("The regulations do allow for considerable discretion in determining the level of sanction to be applied" for noncompliance with program requirements); *Northern Montana Care Center*, 2006 WL 2700729, at *1 ("[B]ecause Defendants had a factual and regulatory basis for their imposition of the DPNA remedy, this Court cannot conclude the Defendants' decision regarding the choice of penalty was arbitrary and capricious, an abuse of discretion, or otherwise not in

accordance with the law"); *Beverly Health & Rehabilitation Services, Inc. v. Thompson*, 223

F.Supp.2d 73, 111 (D.D.C. 2002) ("there can be no question that the agency did not abuse its

discretion by imposing termination, and it is not within this Court's province to substitute its

judgment for the agency's decision that termination was appropriate given the scope and severity

of the deficiencies found").

## CONCLUSION

Defendants' motion for summary judgment (Dkt. #33) is granted in part and denied in

part.  All of plaintiff's claims are dismissed as moot except for the sixth claim.

Plaintiff's motion for summary judgment (Dkt. #19) is granted in part and denied in part.

Plaintiff's motion for summary judgment is grant on its sixth claim relating to the untimely

notice of denial of payment for new admissions.  Unless the parties can agree, the matter on the

sixth claim is remanded to the Department of Health and Human Services, Centers for Medicare

and Medicaid services, for calculation and payment of benefits consistent with this decision.

Defendants' motion to strike (Dkt. #25) is denied as moot.[17]

IT IS SO ORDERED.

_____
DAVID G. LARIMER
United States District Judge

Dated: Rochester, New York
       July 6, 2007.

---

[17]There is a suggestion in plaintiff's papers, that United States Magistrate Judge Jonathan W. Feldman's scheduling order of October 12, 2005 limits the timing of the litigation of some of the claims.  I do not so read the order.  Magistrate Judge Feldman specifically provided that the defendants could move for summary judgment on all causes of action in the complaint.